OPINION
 

 MUIR, District Judge.
 

 I. Introduction.
 

 On February 13, 1990, a grand jury handed down a three-count indictment against Paul W. Asper concerning the unlawful importation, receipt and transportation of wildlife parts. On March 21, 1990, the grand jury returned an additional 20-count indictment against Asper. Upon motion of the Government, we dismissed Counts 4 through 6 and 20 of the indictment returned on March 21, 1990. For the purposes of trial, the indictments were consolidated and the counts were renumbered.
 

 Asper resides in Haneyville, Pennsylvania, where he and his wife, Carole, own and operate a complex of businesses known as the Fin, Fur and Feather Trading Post, the Fin, Fur and Feather Sporting Goods Store, and the Fin, Fur and Feather Wildlife Museum.
 

 Asper was charged under the Endangered Species Act of 1973, Title 16, United States Code, §§ 1531-1543 and Title 18, United States Code, §§ 545 and 2. That act prohibits the importation into the United States of those species of wildlife which are set forth on the “List of Endangered and Threatened Wildlife.” Title 50, Code of Federal Regulations, Part 17, section 11. Under 16 U.S.C. § 1538(c)(1) and 1540(b)(1) Asper was charged with the unlawful possession of animal body parts.
 

 18 U.S.C. § 545 provides in part:
 

 Whoever knowingly and willfully, with intent to defraud the United States, smuggles, or clandestinely introduces into the United States any merchandise which should have been invoiced....
 

 Whoever fraudulently or knowingly imports or brings into the United States, any merchandise contrary to law, or receives, conceals, buys, sells or in any manner facilitates the transportation, concealment, or sale of such merchandise after importation, knowing the same to have been imported or brought into the United states contrary to law—
 

 Shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 

 18 U.S.C. § 2 provides:
 

 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
 

 (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.
 

 Pursuant to 18 U.S.C. §§ 545 and 2 Asper was charged with the importation, receipt, concealment and transportation after importation of various species of wildlife contrary to the Endangered Species Act of 1973 and the Convention on International Trade in Endangered Species of Wild Fauna and Flora (the “CITES” Treaty).
 

 Six species of wildlife involving nine animals were the subjects of the charges: Two Serows (Capricornis sumatraensis) (Counts 1 through 4, 13 through 15), native to Nepal; a Jentink’s Duiker (Cephalophus jentinki) (Counts 5 and 6), native to Liberia, Africa; a Black-faced Impala (Aepyceros melampus petersi) (Counts 7 through 9), native to Namibia (Southwest Africa); An African Wild Dog (Lycaon pictus) (Counts 10 through 12), native to Zambia; two Gor-als (Nemorhaedus goral) (Counts 16 and 17), native to Nepal; and two Northern Huemuls (Hippocamelus antisensis) (Counts 18 and 19), native to Peru.
 

 Asper was charged with importing or bringing into the United States contrary to law the body parts of a Serow (Count 1), a Black-faced Impala (Count 7), and African Wild Dog (Count X) and the horns of another Serow (Count 8). Asper was also charged in several counts with receipt and
 
 *1264
 
 facilitation of transportation of the body parts of the Serow (Count 2), Black-faced Impala (Count 8), African Wild Dog (Count 11) and the horns of a Serow (Count 14) after these were imported into the United States. He was also charged with concealment and facilitation of transportation after importation of the body parts of the Jentink’s Duiker (Count 5). Asper was charged with violating the Endangered Species Act by possessing the body parts of a Serow (Count 4), a Jentink’s Duiker (Count 6), the horns of a Serow (Count 15), two Gorals (Counts 16 and 17) and the antlers of two Northern Huemuls (Counts 18 and 19).
 

 Jury selection was held on July 10, 1990. The trial commenced on July 12, 1990, and ended on August 10, 1990, with verdicts of guilty on all counts except Counts 10 through 12 which involved the African Wild Dog.
 

 Following the return of the jury verdicts we deferred sentencing pending the receipt of a presentenee report and set November 9, 1990, for sentencing.
 

 By order of August 16, 1990, we set a presentence conference for November 7, 1990, and a presentence hearing for November 8, 1990. The presentence report was prepared by Probation Officer Melvin L. Hoover, Jr. The initial presentence report was submitted on September 28, 1990, and a revised presentence report with an addendum on October 26, 1990. After reviewing the presentence report, both Asper and the Government filed various objections to the calculation of the guideline range and alleged factual inaccuracies in the presentence report.
 

 At the presentence conference held at 4:00 P.M. on November 6, 1990, it became evident that a substantial amount of time would be needed for a presentence hearing in light of the considerable number of objections to the presentence report. On November 7, 1990, the presentence hearing was started but continued to November 26, 1990, because of the illness of counsel for Asper. Further hearings relating to the calculation of the guidelines and factual objections to the presentence report were had November 26, 27, 28, 29, 30, December 3, 4, and 5. On December 11, 1990, the presentence hearing resumed for presentation of evidence and argument on departure from the guidelines which is sought by both parties although in different directions. This opinion deals only with the guideline counts.
 

 With regard to the calculation of the guideline range at the time of the presen-tence conference Asper disputed the two-level upwards adjustment for commercial purpose pursuant to U.S.S.G. § 2Q2.1(b)(1), the six-level upwards adjustment for the value of the animal parts pursuant to U.S. S.G. §§ 2Q2.1(b)(3)(A) and 2F1.1, the two-level upwards adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1, and the two-level upwards adjustment for the role Asper played as an organizer, leader, manager or supervisor in the criminal activity pursuant to U.S.S.G. § 3Bl.l(c).
 

 With regard to the two-level upwards adjustment for obstruction of justice, the Probation Officer stated in paragraph 55 of the presentence report that the adjustment was justified because (1) Asper had failed to surrender all valid passports in his possession pursuant to a grand jury subpoena and (2) had instructed an employee to hide the Jentink’s Duiker and photographs of the hunt for that animal when he learned in 1989 that the U.S. Fish and Wildlife Service was examining records at Safari Club International which may have included records relating to his Jentink’s Duiker. The Government raised two additional grounds for the adjustment: (1) Asper had procured false donation certificates purporting to show that the animals parts had been donated prior to the enactment of the Endangered Species Act, and (2) Asper had obliterated the year from a slide photograph showing the hunt of the Northern Huemel in 1978. Asper had asserted to the Safari Club International that the killing and importation of the Northern Huemul took place in 1972 before the passage of the Endangered Species Act. However, a manufacturing code located on the back of the Polaroid film proved that the film of
 
 *1265
 
 the hunt was manufactured in 1977 which was after the date of that statute.
 

 Because the offenses at Counts 4 through 6, 9, and 13 through 19 took place after October 31, 1987, the Sentencing Reform Act of 1984, 28 U.S.C. §§ 991-98, is applicable to those counts. Because the offenses at Counts 1, 2, 3, 7 and 8 took place prior to October 31, 1987, the Sentencing Reform Act does not apply to them. We have calculated the guideline ranges only for the offenses committed after October 31, 1987.
 

 The Government disputed the Probation Officer’s placement of all of the counts in one group pursuant to U.S.S.G. § 3D1.2 arguing that the counts should be placed into two groups and that the base offense level should be adjusted upwards therefor by two levels pursuant to U.S.S.G. §§ 3D1.3 and 3D1.4. Moreover, the Government contended that there should be a four-level upwards adjustment for As-per’s role in the offense pursuant to U.S. S.G. § 3Bl.l(a) because Asper allegedly was an organizer or leader in a criminal activity which involved five or more participants or was otherwise extensive.
 

 The Probation Officer’s position is that the total offense level is 18, the guideline imprisonment range is 27 to 33 months, the fine range is $6000 to $60,000 and that there are no aggravating or mitigating factors that would justify a departure from the guidelines. Asper’s position is that the total offense level is 8, the guideline imprisonment range is 2 to 8 months, the fine range is $1000 to $10,000 and there are mitigating circumstances that justify a downwards departure from the guidelines. The Government’s position is that the total offense level is 22, the guideline imprisonment range is 41 to 51 months, the fine range is $18,000 to $258,000 and there are aggravating circumstances that justify an upwards departure from the guideline range. The Government’s fine range is based in part on U.S.S.G. § 5E1.2(c)(2)(C) which provides for a fine three times the gross pecuniary gain resulting from the criminal activity.
 

 The objections relating to alleged factual inaccuracies as distinguished from the guidelines calculations involved paragraphs 18, 20, 21, and 37 of the presentence report. Paragraph 18 stated that copies of federal wildlife regulations, some with markings or highlightings throughout, were seized from Asper’s basement office during the course of the investigation. Asper disputes the contention in paragraph 18 that all the animals which were the basis of the guilty verdicts were highlighted in various pamphlets. Paragraph 20 of the presentence report dealt with the skins of a Nile crocodile and a leopard hidden in an elephant hide which was brought into the United States by Asper. Asper argues that this information was not introduced into evidence at the trial, was not part of the record in the case and therefore cannot be considered by the Court. Paragraph 21 dealt with statements by Asper regarding importation through Canada and Mexico. Likewise, Asper contends that this information was not introduced into evidence at the trial, is not part of the record and the Court cannot consider it. Paragraph 37 of the presentence report states that Asper told Clifford Hales that the Fish and Wildlife Service was checking records at the Safari Club International headquarters and that Asper was obliged to get his paperwork for the Jentink’s Duiker in order. Asper claims that evidence was presented wherein he was purported to have said that records were being checked at the Safari Club International but not that they were being checked by the Fish and Wildlife Service.
 

 On November 21, 1990, Asper filed a document entitled “Supplemental Memorandum of Law in Support of Motion to Correct Presentence Investigation.” In this document Asper raised an objection to paragraph 56 of the presentence report which states: “Paul W. Asper maintains his innocence and does not accept responsibility for the offenses of conviction. Therefore, under Section 3E1.1 of the guidelines, the offense level is not reduced by 2 levels.” On November 23, 1990, we issued an order that although the objection was raised in an untimely fashion we would
 
 *1266
 
 consider it. On December 3, 1990, the 6th day of the presentence hearing, Asper withdrew his objection to paragraph 56 of the presentence report.
 

 The standard of proof utilized by us in arriving at the findings of fact was that of a preponderance of the evidence. Furthermore, with regard to the upwards adjustments in the offense level as distinguished from an upwards adjustment from the Probation Officer’s calculations the burden of proof or burden of “ultimate persuasion” was placed on the Government.
 
 See United States v. McDowell,
 
 888 F.2d 285, 291 (3rd Circuit 1989).
 

 The following are the Court’s findings of fact, discussion and conclusions of law regarding the calculation of the guideline ranges. The question of departure from the guidelines will be dealt with in a separate opinion and order which we expect to file today or by 10:00 a.m. tomorrow morning, the time of sentence. The hearing on that phase of the presentence procedures was held December 11, 1990.
 

 II.Findings of Fact
 

 1. Paul W. Asper and Carole J. Asper, his wife, operate two partnership ventures: Paul Asper Enterprises and the Fin, Fur, and Feather Trading Post.
 

 2. The Aspers have equal shares in the partnerships.
 

 3. The Fin, Fur, and Feather Wildlife Museum is part of Paul Asper Enterprises.
 

 4. The Fin, Fur, and Feather Sporting Goods Store is part of the Fin, Fur, and Feather Trading Post partnership.
 

 5. The museum, trading post, and sporting goods store occupy separate buildings located near Haneyville, along Route 44 in Lycoming County, Pennsylvania.
 

 6. Asper advertises the museum and the trading post on roadside billboards in the northern central Pennsylvania area. (Government Presentence Hearing Exhibits 425 and 426) (hereafter GE)
 

 7. To enter the museum, visitors must pass through the sporting goods store where tickets to the museum are sold. (Undisputed) (hereafter U)
 

 8. Tour guides are employed by Asper and available to direct visitors through the museum. (U)
 

 9. Asper does not accept donations of wildlife trophies or specimens for the museum. (GE 424)
 

 10. Asper circulates promotional pamphlets describing his museum. (GE 400) (U)
 

 11. Asper promotes the museum as “an unusual collection of hundreds of wildlife trophies from all continents of the world.” (GE 400) (U)
 

 12. The Fin, Fur, and Feather Wildlife Museum is open daily from 9:00 A.M. to 5:00 P.M. from April 15 to December 24. (GE 400) (U)
 

 13. From December 26 to April 14, the museum is open Fridays, Saturdays, and Sundays from 9:00 A.M. to 5:00 P.M. (GE 400) (U)
 

 14. The museum is open to tours by individuals, families, senior citizens, youth groups, and bus trips. (GE 400) (U)
 

 15. The museum is a northern Pennsylvania tourist attraction.
 
 See
 
 Lycoming County Tourist Promotion Agency List. (Defendant’s Presentence Hearing Exhibit 70) (hereafter DE) (U)
 

 16. Asper charges a $5.00 per person entrance fee to tour the museum. (U)
 

 17. The wildlife displayed at the museum are not voucher specimens for scientific research purposes.
 

 18. The principal business of Paul Asper Enterprises is museum services. (GE 403 and 404)
 

 19. Paul Asper and his wife Carole (hereafter The Aspers) file federal partnership income tax returns reflecting the operation of the museum. (GE 403 and 404)
 

 20. Asper takes a tax deduction for the ordinary and necessary expenses paid and incurred as a result of the museum’s operation. (U)
 

 21. The Internal Revenue Service permits business expense deductions only if the individual is engaged in a trade or business. (GE 433 and 434)
 

 
 *1267
 
 22. Asper capitalizes as business expenses his substantial travel and hunting expenses and taxidermy expenses.
 

 23. Asper amortizes and deducts as expenses of the partnership his hunting and travel expenses.
 

 24. Asper depreciates the wildlife trophies in the museum. (U)
 

 25. The museum displays are wildlife collected by Asper and placed on display by Asper in the museum.
 

 26. Over the years, Asper has depreciated several sets of museum displays. (GE 404)
 

 27. Asper gains a significant tax benefit due to his depreciation of the museum assets. (U)
 

 28. Asper reported a profit for the museum operation in the fiscal year ending March 31, 1987, even after deduction of substantial travel and hunt expenditures.
 

 29. For the fiscal years ending March 31, 1986 and March 31, 1987, and the calendar years 1987 and 1989, travel and hunt expenditures totalling $140,792 were capitalized and deductions taken with respect to the same by Asper for income tax purposes.
 

 30. Asper maintains books and records for his museum operation. (U)
 

 31. Asper does not operate the museum as a “not-for-profit” entity; therefore, the operation is not exempted from federal income tax. (U)
 

 32. Asper uses a portion of the gross profits from the operation of the museum to pay for his hunting trips. (GE 402) (U)
 

 33. According to Asper’s federal tax returns, Paul Asper Enterprises made a net profit in the tax years 1986, 1987, and 1989. (GE 439, 441, 442)
 

 34. Asper maintains a business checking account in the name of Paul Asper Enterprises. (U)
 

 35. Asper’s “at cost” (not current value) investment in the Fin, Fur and Feather Museum is $280,000.00.
 
 See
 
 Financial Statement dated September 30, 1990. (GE 401) (U)
 

 36. The financial statement prepared by KPMG Peat Marwick states that Asper’s investment in the Fin, Fur and Feather Trading Post and the Fin, Fur and Feather Wildlife Museum, and his personal residence and land holdings are stated at historical cost, not current value. (GE 401) (U)
 

 37. The financial statement prepared by KPMG Peat Marwick was based on information provided the accountant by Asper. (U)
 

 38. The financial statement was not audited. (U)
 

 39. Paul Asper Enterprises operated at a profit during the years 1987 and 1988. IRS Form 1065 (Years 1987; 1988) (GE 403, 404)
 

 40. For the years 1984, 1985 and 1986, Asper reported losses on his personal return from the partnership Paul Asper Enterprises. (GE 402) (U)
 

 41. Asper claimed these losses on his personal returns to offset other income. (U)
 

 42. These losses could be claimed on the personal returns to offset other income only if they were losses related to a business.
 

 43. In tax year 1987, the amount of gross receipts at the museum was $113,049.00. (GE 403) (U)
 

 44. The cost of goods sold for the same year was $23,718.00. (GE 403) (U)
 

 45. The 1987 gross profit for the museum was $89,331.00. (GE 403)
 

 46. Asper reported income of $51,692.00 in 1987 for Paul Asper Enterprises. (GE 441)
 

 47. Asper took $47,110.00 in depreciation in 1987 as a result of his operation of the museum. (GE 441) (U)
 

 48. Asper also took an additional $5,824.00 in deductions in 1987 as a result of his operation of the museum. (GE 441) (U)
 

 49. In tax year 1988, gross receipts of Paul Asper Enterprises was $189,704.00. (GE 404)
 

 50. The cost of goods sold by Paul Asper Enterprises in 1988 was $47,423.00. (GE 404)
 

 
 *1268
 
 51. Asper took $63,799.00 in depreciation in 1988 as a result of the museum operation. (GE 404) (U)
 

 52. Asper depreciated museum “displays” in 1988 in the amount of $2,969.00. (U)
 

 53. The total amount of depreciation taken for displays in 1988 was $54,784.00. (GE 404) (U)
 

 54. Asper pays taxes on his operation of the museum. (GE 404) (U)
 

 55. Asper reported $50,306.00 income in 1988 for the museum operation. (GE 402) (U)
 

 56. Asper reported $6,502.00 income in 1989 for the museum operation. (GE 442) (U)
 

 57. For the last five tax years, Asper capitalized and deducted taxidermy costs for wildlife mounts in the total amount of $88,-800.00. (DE 1)
 

 58. Asper indicated on the 1988 Partnership Return for Paul Asper Enterprises that the percent of business purpose for the museum “displays” was 100%.
 
 See
 
 Schedule for Depreciation and Amortization Claimed. (GE 404)
 

 59. Although Asper indicated on Column C of the Schedule for Depreciation and Amortization Claimed a “date acquired”, Mr. Grill testified that the wildlife was acquired over a period of time, not just on the date listed on the return. (GE 404) (U)
 

 60. Grill is a C.P.A. employed by KPMG Peat Marwick who has serviced the Aspers’ accounts for several years.
 

 61. Asper uses the full cost of travel, hunting and taxidermy expenses as the basis of the wildlife for depreciation.
 

 62. Asper took $54,902.00 in depreciation for the wildlife displays on his partnership return for tax year 1988. (GE 404) (depreciation schedule) (U)
 

 63. The Aspers entered into a contract on August 12, 1976, with The National Taxidermists Association to house at the As-pers’ museum specimens elected to the “Hall of Fame” established by the Taxidermists Association.
 

 64. Paragraph 7 of that agreement provides: “That the Aspers shall operate said museum on a commercial basis, including the charging of admission to the museum.”
 

 65. Asper operates the museum as a business.
 

 66. Prior to tax year 1987, no land sales were reported under Paul Asper Enterprises. (U)
 

 67. In 1984, Asper used the loss he reported for the operation of the museum ($53,-826.00), which was reduced by $262 income for the Fin, Fur and Feather Trading Post, to offset the personal income generated by his interest income to arrive at a reduced gross income for that tax year. (GE 437, p. 1) (U)
 

 68. In 1985, Asper used the loss he reported for operation of the museum ($50,-028.00), which was reduced by $24,753.00 income for the Fin, Fur and Feather Trading Post to $25,275.00, to offset the $61,-400.00 interest income and $33,617.00 capital gains and $471.00 dividends to reduce the gross income reported for that tax year. (GE 438, Line 18, p. 1; Sch. E) (U)
 

 69. In 1986, Asper reported a $56,236.00 loss for the museum operation. (GE 439, Schedule E) (U)
 

 70. Asper offset the income generated by the trading post to arrive at a total partnership (Paul Asper Enterprises and Fin, Fur and Feather Trading Post) loss of $33,-006.00 for 1986. (GE 439) (U)
 

 71. Asper offset the reported gross income amounts for 1986 (interest income: $52,946.00; dividend income: $504.00; and capital gains: $13,175.00) with the total partnership loss. (GE 439 at p. 1, Line 18) (U)
 

 72. Asper’s personal return for 1987 consolidated the partnership reports for two tax periods due to change in the tax laws. (GE 441, Statement 4) (U)
 

 73. Asper’s 1987 personal return show income attributable to Paul Asper Enterprises in the amount of $51,692.00, and a loss of $41,713.00 for Paul Asper Enterprises, for a net partnership income of $9,979.00. (GE 441, Statement 4) (U)
 

 
 *1269
 
 74. That net income amount was part of a total partnership profit of $45,199.00 for 1987. (GE 441, statement 4) (U)
 

 75. In sum, Asper used the museum operation losses to offset income on his personal returns. (U)
 

 76. Asper also used his hunting expenditures which were very substantial in effect to offset income on his personal income tax returns.
 

 77. Asper’s partnership income and losses “flowed through” to his personal returns. (U)
 

 78. KMPG Peat Marwick and its predecessor companies did not audit Asper’s tax returns, nor the return information or information provided to Mr. Grill for preparation of the financial statements. (U)
 

 79. The financial statements referred to in the previous paragraph are DE 1.
 

 80. The trading post and sporting goods store were “feeders” for the museum.
 

 81. The net worth of the Aspers cannot be accurately calculated because they refused to provide their accountant with current values of their assets.
 

 82. The Black-faced Impala, the Serow, the Goral, the Jentink’s Duiker, and the Northern Huemul in this case are endangered and were endangered when Asper shot them and imported them into the United States.
 

 83. Moreover, the Huemul, Jentink’s Duiker, the Goral, and the Serow are listed on the CITES Appendices. (U)
 

 84. All are globally threatened (the ESA/CITES LISTS protects “entire range” of these species throughout the world), 50 C.F.R. parts 17 and 23.
 

 85. There is no market for endangered species in this country.
 

 86. Under limited circumstances, endangered and protected wildlife can be imported into the United States. (U)
 

 87. However, sale or exchange of such wildlife is prohibited in the United States except under limited circumstances for scientific purposes.
 

 88. There is no legal market for endangered species save the highly limited market relating to acquisition by those institutions which qualify for exemption under 16 U.S.C. § 1539; 50 C.F.R. §§ 17 and 23.
 

 89. Those institutions are classified as scientific entities. (U)
 

 90. There is no fair market value for endangered species in the United States.
 

 91. The larger the wildlife trophy, the higher the value, especially if the trophy is of record quality.
 

 92. Trophy-class wildlife is valued higher than the average for the species.
 

 93. The wildlife mounts were trophy quality. (U)
 

 94. Asper placed the Gorals on display in his museum. (U)
 

 95. Currently there are no captive breeding/reintroduction programs in the world for the wildlife animals involved in this case.
 

 96. Asper placed the Serow on display in his museum. (U)
 

 97. Asper entered this Serow in the Safari Club International (hereafter SCI) Record Book of Trophy Animals. (U)
 

 98. The Serow is ranked 12th in the world. (U)
 

 99. Asper displayed the Huemul antlers in his museum. (U)
 

 100. Asper entered the Huemul antlers in the SCI Record Book. (U)
 

 101. The Huemuls were ranked 2nd and 8th in the world. (U)
 

 102. The Huemul which was ranked 2nd in the world was at one time the world record. (U)
 

 103. Asper placed the Serow horns on display in the museum. (U)
 

 104. Asper displayed the Black-faced Impala in his museum. (U)
 

 105. Asper entered the Black-faced Impala in the SCI Record Book. (U)
 

 106. The Black-faced Impala was ranked 12th in the world. (U)
 

 107. Asper placed the Jentink’s Duiker on display in his museum. (U)
 

 
 *1270
 
 108. Asper entered the Jentink’s Duiker in the SCI Record Book. (U)
 

 109. The Jentink’s Duiker is ranked as number one in the world.
 

 110. Thomas Paulshock mounted Asper’s Serow for $700 and the Black-faced Impala for $950.00 in Baltimore, Maryland.
 

 111. John Boone mounted the two Corals for $4,500.00 in Denver, Colorado.
 

 112. Ken Rhinehart mounted the Jentink’s Duiker for $821.00 in Waterville, Pennsylvania.
 

 113. The full mounted wildlife, the Huem-ul antlers and the Serow horns are valued in these findings in the condition in which they were seized in the museum.
 

 114. The endangered animals were part of a large collection of animals in the museum. (U)
 

 115. Fair market value is the generally accepted and preferred method of valuing property.
 

 116. The trophy mounts in this case are not capable of being valued at a fair market value.
 

 117. Replacement value can be determined although it is illegal to sell the wildlife parts.
 

 118. The antler mounts involved in this case can often be obtained from local native hunters at a low cost.
 

 119. The value of the live animals is not a fair method of determining the value of the trophy mounts.
 

 120. The value of the animal parts can be determined even though it is illegal to buy and sell the trophy mounts in this country because there are countries where it is not illegal to trade in such items.
 

 121. Asper did not have insurance coverage on the trophy mounts and they were not valued for insurance purposes.
 

 122. Richard D. Roan, an experienced auctioneer and appraiser called by the Defendant, determined that the value of the wildlife trophies at auction is $8,050.00.
 

 123. Mr. Roan testified that there is no fair market value of the trophies involved in this case because the wildlife were endangered.
 

 124. Roderick F. Connelly, a taxidermist called by the Government, appraised the wildlife trophies at $101,383.50.
 

 125. William Lee Birch, a taxidermist and an arranger of safaris called by the Defendant, appraised the wildlife trophies at $16,400.00.
 

 126. Both Mr. Roan and Mr. Birch wrote letters on Asper’s behalf and forwarded them to the Court. (U)
 

 127. Mr. Birch arranged the hunt to Namibia for Asper in 1985 on which Asper hunted and collected the Black-faced Impala.
 

 128. Roan’s appraisal is not determinative because the exhibits in this case cannot be sold at public auction.
 

 129. Connelly’s valuation of the cost of acquisition or replacement (airfare, hunting costs, trophy fees, etc.) is not persuasive because it is possible to obtain the “cape” (headskin) or full body skin by purchase in the country of origin of the species in question.
 

 130. Birch’s valuation was based on the replacement costs, the cost of taxidermy plus a profit to the dealer.
 

 131. Birch did not consider scientific value, record book ranking or rarity of the wildlife trophies.
 

 132. Birch did consider, when applicable, artistic value.
 

 133. To reflect scientific value, record book ranking and rarity, it is appropriate to increase Birch’s appraisal.
 

 134. The value of a wildlife trophy is routinely increased 50% in the trade for scientific value. (GE 498)
 

 135. The value of a wildlife trophy is routinely increased 50% in the trade for record book ranking. (GE 498)
 

 136. The value of a wildlife trophy is routinely increased 100% in the trade for rarity. (GE 498)
 

 137. Birch appraised the Jentink’s Duiker mount at $3,000.00.
 

 
 *1271
 
 138. In appraising the Jentink’s Duiker mount, Birch did not consider the extreme rarity of this species or that this specimen is the # 1 record.
 

 139. Birch appraised the male Goral at $3,000.00 and the female Goral at $2800.00.
 

 140. Birch appraised the full mounted Ser-ow at $3500.00.
 

 141. Birch appraised the Black-faced Impala at $3500.00.
 

 142. Birch appraised each of the two sets of Huemul horns at $200.00.
 

 143. Birch appraised the Serow horns at $200.00.
 

 144. Connelly’s appraisal of the wildlife trophies was based on a calculation of the acquisition costs which included airfare, hunt, trophy fee, shipping and handling, incidental and taxidermy costs to arrive at a base value.
 

 145. Connelly’s appraisal is also based on the assumption that one of these rare animals would be taken on one hunt.
 

 146. It is unlikely that a Jentink’s Duiker could be taken on one expedition.
 

 147. Connelly increased the base value in appropriate circumstances by various factors: 50% for scientific value, 50% for art value, 50% for record book ranking and 100% for rarity.
 

 148. Birch’s appraisal of the wildlife trophies was based on adding the taxidermy charges to the cost of replacing the wildlife part in question plus a profit for the dealer and is the most nearly accurate of those submitted at the hearing.
 

 149. Birch’s appraisal of each Goral should be increased 50% for scientific value. (GE 498)
 

 150. Birch’s appraisal of the Black-faced Impala should be increased 50% for scientific value and 50% for record book ranking. (GE 498)
 

 151. Birch’s appraisal of the full mounted Serow should be increased 50% for scientific value and 50% for record book ranking. (GE 498)
 

 152. Birch’s appraisal of the Jentink’s Duiker should be increased 50% for scientific value and 100% for rarity. (GE 498)
 

 153. The valuation that we place on the wildlife trophies is an approximation in part because the acquisition cost as determined by Birch on which our value is primarily based includes an unknown factor added as profit to the dealer.
 

 154. The value of the wildlife in this case is as follows:
 

 Birch s value Courts value
 

 $ 3,000.00 $ 4,500.00 (a) life size mount of male Goral
 

 2,800.00 4,200.00 (b) life size mount of female Goral
 

 3,500.00 7,000.00 (c) life size mount of Black-faced Impala
 

 3,500.00 7,000.00 (d) life size mount of female Serow
 

 3,000.00 7,500.00 (e) life size mount of Jentink’s Duiker
 

 200.00 200.00 (f) Huemul antlers
 

 200.00 200.00 (g) Huemul antlers
 

 200.00 200.00 (h) Serow horns
 

 Total value O o o o 00 o CO se-05 o p o o
 

 155.A federal grand jury sitting in Scranton, Pennsylvania, issued a subpoena which was served on Asper on February 9, 1990. (GE 408)
 

 156.The subpoena was served on Asper’s chief trial attorney, J. Alan Johnson, Esquire, who accepted service on Asper’s behalf. (GE 408 and 410)
 

 
 *1272
 
 157. Pursuant to the subpoena, Asper was directed to surrender on February 13, 1990, at Scranton all valid passports in his possession. (U)
 

 158. J. Alan Johnson, Esquire, and Asper appeared at the federal building at Scranton, Pennsylvania on February 13, 1990, the return date of the subpoena, to surrender Passport 09047748. (U)
 

 159. On February 13, 1990, Asper surrendered a single passport numbered 090477348 in Scranton, Pennsylvania.
 

 160. Passport 090477348 was issued to Asper at Philadelphia, Pennsylvania on July 17, 1987. (GE 405). (U)
 

 161. Passport 090477348 did not reflect any entries for the trips during which As-per hunted the subject endangered species. (U)
 

 162. At the initial bail hearing on August 10, 1990, the United States introduced U.S. State Department records showing that As-per applied for and was issued two passports since 1985. (U)
 

 163. The records showed that the second passport, numbered Z4972090, with an expiration date of February 21, 1995, had been issued to Asper in Kathmandu, Nepal on February 22, 1985. (U)
 

 164. Passport Z4972090 was stamped, on July 21, 1987, as follows:
 

 This passport is only valid for travel to— REPUBLIC OF SOUTH AFRICA AND NAMIBIA. (GE 406, p. 22). (U)
 

 165. The United States argued at the bail hearing that Asper posed a flight risk due to the fact that he had not surrendered passport Z4972090 which was still valid. (U)
 

 166. Asper was detained pending sentencing. (U)
 

 167. Just prior to the commencement of the second detention hearing on August 31, 1990, Carole Asper delivered Passport Z4972090 to George Lepley, Esquire, while Asper was detained at Union County Jail. (U)
 

 168. Asper last used the passport Z4972090 in June 1987. (GE 406, passport at p. 20) (U)
 

 169. Asper used passport Z4972090 to travel to the following countries on the following dates:
 

 (a) Nepal on January 19, 1985 (Passport at p. 7) (U)
 

 (b) Republic of South Africa and Namibia, November 3, 1985 (Passport at pp. 6, 12, 13) (U)
 

 (c) Zambia, August 1986 (Passport at p. 14) (U)
 

 (d) Nepal, January 1987 (Passport at p. 25) (U)
 

 170. On each of these trips, Asper hunted and killed some of the endangered wildlife that were the subject of this prosecution.
 

 171. Asper hunted and collected some of the endangered wildlife in this case in the following countries:
 

 (a) Nepal (February 14, 1985): Serow (full mounted)
 

 (b) Namibia (November 9, 1985): Black-faced Impala (Government Trial Exhibit 87) (hereafter GTE)
 

 (c) Nepal (January 1987): Serow (horns)
 

 172. On January 19, 1985, Asper entered the country of Nepal using Passport A1020215. (GE 406, p. 7) (U)
 

 173. On February 22, 1985, Asper applied for and received Passport Z4972090 in Kathmandu, Nepal. (U)
 

 174. Passport Z4972090 was issued in Kathmandu, Nepal because Passport A1020215 was about to expire on March 7, 1985.
 

 175. Asper departed Nepal on March 15, 1985. (GE 406, p. 7) (U)
 

 176. On November 3, 1985, Asper entered the country of Southwest Africa using Passport Z4972090. (U)
 

 177. On November 14, 1985, Asper departed Southwest Africa using Passport Z4972090. (U)
 

 178. On January 29, 1987, Asper arrived in the country of Nepal using Passport Z4972090. (U)
 

 179. During that 1987 trip to Nepal, As-per collected the Serow horns. (U)
 

 180. On July 23, 1986, Asper entered the country of Zambia using Passport Z4972090. (U)
 

 
 *1273
 
 181. On June 14, 1984, Asper hunted in the country of Liberia. (U)
 

 182. Among the tropies he collected on this last mentioned hunt was the Jentink’s Duiker.
 

 183. The SCI Record Book of Trophy Animals listed Asper and his world record Jen-tink’s Duiker. (GTE 144)
 

 184. The Record Book also shows Asper posing with the dead Jentink’s Duiker in the field. (GTE 144)
 

 185. The record book photograph matches one of the photographs that Asper removed from display in the museum and placed in his museum office.
 
 (Compare
 
 GTE 62.5 and GTE 144.)
 

 186. The score sheet listing the information concerning Asper’s hunt of the Jen-tink’s Duiker including the date taken and location taken was on file at Safari Club International when the federal investigation “pulled records” in January 1989. (GTE 58)
 

 187. Asper received a phone call from Safari Club International warning him that some records had been “pulled.”
 

 188. Asper was not sure whether his records were being examined by the federal agents although the telephone call from Safari Club International officials alerted him that the # 1 record animal of an endangered species, the Jentink’s Duiker, shown on the records to have been killed after the species was placed on the endangered list would receive attention by the federal agents.
 

 189. The Jentink’s Duiker was listed as an endangered species and thus could not be imported into the United States. (U)
 

 190. During January, 1989, Asper instructed his employee Clifford Hales to move the Jentink’s Duiker and photographs of Asper’s hunt in which he shot that animal from the display in the museum.
 

 191. The Jentink’s Duiker was moved in January of 1989 from the museum. (U)
 

 192. Clifford Hales testified that Asper directed that the Jentink’s Duiker be moved because of records being checked by Federal Agents at Safari Club International. (U)
 

 193. Hales testified that Asper instructed Hales to move the Jentink’s Duiker until he could get his paperwork in order. (U)
 

 194. Asper directed Hales to place the Jentink’s Duiker in the cabin of Dorothy Shanklin.
 

 195. Dorothy Shanklin is a friend of the Asper family. (U)
 

 196. Dorothy Shanklin was in attendance throughout the trial and the presentence hearing.
 

 197. Dorothy Shanklin owned the cabin across the street from the Fin, Fur & Feather Wildlife Museum. (U)
 

 198. The cabin was not Shanklin’s permanent residence and she was not residing there at that time. (U)
 

 199. Hales also removed photographs of the Jentink’s Duiker from the museum and placed them in the cabin.
 

 200. Hales testified that he moved the Jentink’s Duiker back into the museum about six weeks later. (U)
 

 201. Hales was assisted in that operation by John Keiffer, another employee of Asper’s.
 

 202. Hales put the Jentink’s Duiker back on display.
 

 203. However, at Asper’s direction, Hales did not place the photographs back on display.
 

 204. Asper placed the photographs relating to the Jentink’s Duiker in the museum’s office.
 

 205. The Jentink’s Duiker photographs were located in Asper’s desk by agents of the United States Fish and Wildlife Service. (U)
 

 206. At the time Hales returned the Jen-tink’s Duiker to the museum, Asper showed him a letter alleging the donation of the Jentink’s Duiker.
 

 207. Hales testified that Asper had a donation letter from either a doctor or a dentist. (U)
 

 208. Seized from Asper’s residence was a letter from Dr. Cecil Van Kleek alleging
 
 *1274
 
 the donation of the Jentink’s Duiker to Asper. (GE 422) (U)
 

 209. The letter was dated March 2, 1972, nearly seven years before the Jentink’s Duiker was listed as an endangered species. (U)
 

 210. Along with this donation letter, a letter from Van Kleek to Asper dated March 3, 1989 was seized from Asper’s files. (U)
 

 211. In that letter, Van Kleek wrote:
 

 Any information you desire from me please ask. If you desire more than enclosed please do not hesitate to ask.
 

 (GE 423) (U)
 

 212. Van Kleek forwarded the false donation letter to Asper along with the March 3, 1989, letter.
 

 213. This false donation letter was procured by Asper to cover the Jentink’s Duiker because of initiation of a federal investigation into the records of Safari Club International.
 

 214. Obtention of the false donation letter was what Asper meant by getting his “paperwork” in order.
 

 215. The false letter dated March 2, 1972, was sent to the Internal Revenue Service laboratory for ink analysis.
 

 216. The ink used in Van Kleek’s signature was not produced until April 1979.
 
 See
 
 IRS Lab Report dated February 23, 1990. (GE 447)
 

 217. Van Kleek’s signature could not have been written until after March, 1979.
 

 218. In April and May, 1978 Asper hunted in the country of Peru. (U)
 

 219. The Northern Huemul was listed on both the endangered species and CITES Appendix I in 1978 and thus was prohibited from importation into the United States. (U)
 

 220. Asper killed two Northern Huemuls in Peru during his 1978 hunt.
 

 221. Two sets of Huemul antlers were seized from Asper’s museum. (U)
 

 222. The SCI Record Book of Trophy Animals does not list the date (or has discrepancies) involving the date Asper killed the Northern Huemuls. (U)
 

 223. The 1989 edition of the SCI Record Book of Trophy Animals listed one of As-per’s Huemuls as being taken in June, 1983. (U)
 

 224. On January 27, 1989, Asper telephoned Dave Lauzen, Safari Club International Record Book Committeeman for the Americas, and told Lauzen that he had made only one trip to Peru, that that trip was in May, 1972, and that both his Huem-uls were taken in that month. (GTE 540)
 

 225. Based on this information, Lauzen instructed Safari Club International Headquarters to change the date in the record book from 1983 to 1972 to reflect this false date of taking the Huemul.
 

 226. A photograph appears in the 1989 SCI Record Book of Trophy Animals picturing one of the Asper’s Huemuls. (U)
 

 227. The caption under the photograph reads, “Paul W. Asper’s No. 2 Taruca”. (U)
 

 228. Taruca is another name for Huemul.
 

 229. A photographic slide, identical to this photograph, was obtained from a slide carousal seized from Asper’s residence.
 

 230. Each slide was date-stamped at the time of processing, “May, 78”. (U)
 

 231. the year was obliterated from the slide that was identical to the photograph in the SCI record book.
 

 232. The slide box in which the slide was stored by Asper was labelled “Peru Mountain and Jungle Hunt, 1972”. (U)
 

 233. In November, 1978, Asper hunted in the country of Nepal.
 

 234. He was accompanied on the Nepal trip by Dr. Cecil Van Kleek.
 

 235. Among the trophies that Asper killed on that trip were two Gorals.
 

 236. The Gorals were listed as both an endangered and CITES Appendix I species and thus could not be imported into the United States. (U)
 

 237. Sometime during early 1980, John Boone, a taxidermist from Denver, Colorado, received two Gorals from Asper to be mounted.
 

 
 *1275
 
 238. In a letter dated July 16, 1980, from Boone to Asper, Boone refers to a letter Asper had provided him several months earlier alleging the donation of the Gorals to Asper by Dr. Van Kleek. (GE 415).
 

 239. Located in Asper’s files was a letter dated April 5 from Van Kleek to Asper. (GE 420) [N.B. No year given in date.]
 

 240. This letter was written in 1980.
 
 See
 
 letter dated May 20, 1980 from Asper to Van Kleek in which Asper refers to the April 5 letter. (GE 421, at p. 1)
 

 241. In that letter Van Kleek said, “I’m sending your request regarding the gorals. This is even old stationary (sic) that it is typed upon”. (GE 420)
 

 242. On May 20, 1980, Asper replied to Van Kleek “Many thanks for the correspondence on the Gorals. Thanks also for using the old stationary — I do not contemplate any problems.” (GE 421)
 

 243. A letter alleging the donation of skins, horns and skulls of three Gorals from Asper to Dr. Van Kleek was seized from Asper’s residence. (GE 419)
 

 244. The letter was dated March 20, 1971, over one year before the enactment of the Endangered Species Act of 1973, and over four years before the Goral was protected by CITES or listed by the Endangered Species Act. (U)
 

 245. In the letter dated March 20, 1971, Van Kleek provides as follows:
 

 To Whom It May Concern,
 

 It is with the greatest pleasure that I donate to Paul Asper’s museum the full skins, horns and skulls of three gorals that I obtained while hunting in Northern India in 1969.
 

 (GE 419)
 

 246. On that letter, Asper wrote: “Correction (2) Goral & (1) Serow”. The March 20, 1971 letter was the letter forwarded to Boone to cover the Gorals.
 

 247. A tissue copy of the same letter was obtained from John Boone. (GE 457)
 

 248. Asper planned all the hunting trips on which he hunted the endangered and protected wildlife.
 

 249. Asper paid for these trips out of partnership monies.
 

 250. Asper was responsible for bringing the wildlife parts into the United States.
 

 251. Asper selected each taxidermist for the mounting of his smuggled wildlife trophies.
 

 252. Asper was responsible for delivery and receipt of the wildlife parts to and from the taxidermist.
 

 253. Asper directed his employees to assist him with the movement and display of the wildlife trophies.
 

 254. Asper recruited his wife to assist him in the delivery and transportation of certain of these wildlife parts.
 

 255. The late John Boone was a taxidermist residing in Denver, Colorado.
 

 256. Boone mounted the two Gorals.
 

 257. Boone knew Gorals were endangered.
 
 See
 
 Letter dated July 16, 1980. (GE 416)
 

 258. In the July 16, 1980 letter to Asper, Boone refers to a letter donating hides, horns and skulls:
 

 A month or so ago you sent me a photocopy of a letter given to you by your friend Dr. VanKleek. It mentions some hides, horns and skulls he was donating to your museum. Nothing is said about the skeletons. I have never been inspected but as I become better known that could happen. Several years ago a taxidermist friend of mine was heavily fined for having some illegal birds in his possession. The two skeletons I have are still relatively fresh. Could you send me a letter telling me what they are and asking me to make whatever use I can of them.
 

 (GE 415 at p. 1)
 

 259. In another letter from Boone to As-per dated February 17, 1983, Boone stated: “As for your goral, they fall into a very special category. In view of their status you hesitate to let anyone know that you have them.”
 
 See
 
 Letter dated February 17, 1983. (GE 416 at p. 2)
 

 
 *1276
 
 260. The Gorals mounted by Boone were the same Gorals Asper took in Nepal in 1978.
 

 261. Boone provided the U.S. Fish and Wildlife Service with the tissue copy of the letter he received from Asper purporting donation of the Gorals by Cecil Van Kleek. (GE 457)
 

 262. This letter motivated Boone to mount the Gorals.
 

 263. Boone was in knowing possession of the two Gorals during the time he mounted the Gorals.
 

 264. The Goral specimens mounted by John Boone in 1980’s were still fresh.
 

 265. Boone’s total fee for mounting the two Gorals was $4500.00. Letter dated June 12, 1983. (GE 513)
 

 266. John Boone died on January 16, 1990. Death certificate (GE 445) (U)
 

 267. Boone mounted the Gorals during the years 1980 through 1983.
 

 268. Van Kleek’s letter of donation of these Gorals is false.
 

 269. Carole Asper transported the Serow and the Black-faced Impala from Haney-ville, Pennsylvania, to Baltimore, Maryland, for mounting by taxidermist Thomas Paulshock.
 

 270. While transporting the wildlife from Haneyville, Pennsylvania, to Baltimore, Maryland, Carole Asper was in knowing possession of these wildlife trophies.
 

 271. The Jentink’s Duiker was mounted by Ken Rhinehart in Summer 1984.
 

 272. Van Kleek aided and abetted Asper by producing, at Asper’s direction, spurious letters alleging pre-Endangered Species Act donations of the Jentink’s Duiker and the Gorals.
 

 273. In 1980, Van Kleek participated in a scheme with Asper, Michael Valencia and a Mexican national to retrieve other Gorals and Serows from Mexico after Van Kleek shipped the trophies on Asper’s behalf to Mexico City.
 

 274. On the return trip from Nepal in 1980, Van Kleek shipped some parts of Serows and Gorals belonging to Asper to Mexico City from London Heathrow Airport. (GE 502, pp. 4-6)
 

 275. In a letter dated February 25, Van Kleek tells Asper that he sent the wildlife trophies to Mexico City.
 

 276. In the letter of February 25, Van Kleek writes:
 

 Your name was not used.
 
 I believe everything will go well to Mexico City. For awhile I thought that I would be looking out of Old Bailly. (sic)
 

 (GE 503, p. 2)
 

 277. Mexican customs seized the trophies.
 

 278. Asper enlisted the help of Michael Valencia in order to recover the trophies from Mexico City.
 

 279. In a letter dated July 17, 1981, Valencia writes Asper
 

 And it was at your request that he [Mario Augilar] offered a $10,000.00 peso ($500.00) reward_ He plainly wants to know if you want the trophies or not. He cannot tell you wether (sic) all the horns are there, in this you would have to take a chance
 
 *
 
 * *
 

 I will asume that you would not want the trophies, I am sure there is even a bigger bill now. (Emphasis added by Court) (GE 502).
 

 Also in that letter, Valencia writes:
 

 What the Customs Officials did In Mexico, they do to anyone, regardless of race, nationality or financial position. So they were not aiming at you, Van Kleek or his or your pocket and if they were, Mario Aguilar got a guilty verdict when he was only trying to help you.
 

 In another letter, Valencia writes Asper: Many times I told you to send any trophies directly to Alvaro marked a person-nal (sic) affects (sic), because once they get to Mexico City as anything coming from outside the country they getsent (sic) to a special customs house for inspection unlike anything you have ever seen in the USA.
 

 (GE 504)
 

 280. In another letter, Valencia writes As-per:
 

 
 *1277
 
 I feel bad about the outcome of this. You and the good Dr lost your trophies and Mario went thru a lot of trouble for nothing.
 

 * * * * * *
 

 When and if you want to send anyother (sic) articles to Mexico, remember to ask me how to address and where to send the package.
 

 ******
 

 Please send the check to Mario at your earliest convenience. Good Hunting!!!
 

 (GE 505)
 

 281. Asper directed Valencia to arrange for the Gorals to be retrieved from Customs by a payment of a “reward”.
 

 282. Efforts to retrieve the animals from Mexican customs were unsuccessful.
 

 283. Upon his return from Liberia in May 1984, Asper requested that Rhinehart mount the Jentink’s Duiker which Asper had illegally brought into the United States.
 

 284. Paulshock performed taxidermy work on the Black-faced Impala and the Serow.
 

 285. Paulshock knowingly received each of these illegally imported animals after they were transported to Baltimore, Maryland from Haneyville, Pennsylvania, by Carole Asper.
 

 286. Asper’s unlawful activities with respect to importation of endangered species span the period from at least 1976 through 1989.
 

 287. Asper hunted and took the two Northern Huemuls in the Spring 1978 in Peru.
 

 288. Asper hunted and imported wildlife from various parts of the world since 1976. (U)
 

 289. On September 10, 1976, Asper imported a shipment of hunting trophies into the United States. (GE 465)
 

 290. Included in the shipment was a large elephant skin which was packed dried.
 

 291. Hidden deep within the folded elephant skin were the hides of a leopard and a Nile crocodile.
 

 Each of these hidden species of wildlife was listed as endangered and prohibited from importation into the United States. 292.
 

 293. On July 22, 1977, Asper called the United States Fish and Wildlife Service office located at the John F. Kennedy International Airport in Lawrence, New York.
 
 See
 
 Presentence Report ¶ 21 and Defendant’s objection thereto.
 

 294. Asper was inquiring about his shipment of hunting trophies detained by the Fish and Wildlife Service.
 

 295. Asper spoke to Wildlife Inspector John Meehan.
 

 296. During the conversation Asper said to Meehan, “John, if I can’t get my trophies into the country honestly, then I will sneak them in through Mexico or Canada. I want my property and I don’t care what means I have to go through to get them in.” (GTE 8)
 

 297. On July 28, 1977, Asper again called the Fish and Wildlife Service office at Kennedy Airport regarding his hunting trophies.
 

 298. This time Asper spoke with Special Agent Christopher Dowd.
 

 299. During the conversation, Asper told Dowd that the Fish and Wildlife Service would never see another one of his shipments because he would import through Canada or Mexico. See telephone conversation record. (GE 443 and GTE 9)
 

 300. Asper was assessed a $1,200 civil penalty for these violations of the Endangered Species Act and the Lacey Act. (U)
 

 301. Asper paid the $1,200 civil penalty.
 
 See
 
 Presentence Report 1120 and Defendant’s objection thereto.
 

 302. Carole Asper signed the check for $1200.00 sent for payment of the civil penalty levied against Paul Asper for importation on September 10, 1976 of the Leopard hide and Nile crocodile skin secreted in the elephant skin.
 

 303. In 1977 Asper made it clear that his elephant hides, leopard hide and Nile crocodile skin which had been seized in 1976 were worth $19,000 and he wanted to get them into the United States. (GTE 8)
 

 
 *1278
 
 304. Asper travelled to three continents of the world collecting his endangered trophies between 1978 and 1987.
 

 305. Steven Bivona, a taxidermist from Lima, Ohio, refused to mount Asper’s Black-faced Impala upon recognizing that the animal was endangered, and confronted Asper with this illegality.
 

 306. Asper’s employees at the Fin, Fur and Feather complex assisted Asper in handling and displaying his wildlife trophies. (U)
 

 307. Van Kleek’s letter purports donation of the Gorals to Asper’s museum in 1971. (U)
 

 308. The Endangered Species Act was not enacted until December 1973. (U)
 

 309. The Goral was not listed as protected under the CITES treaty until July 1, 1975. (U)
 

 310. The Goral was not listed as endangered until June 14, 1976. (U)
 

 311. Asper did not open the museum until 1978.
 
 See
 
 Presentence Report, paragraph 90. (U)
 

 312. Van Kleek’s other letter of donation purports donation of a Jentink’s Duiker to Asper in March 1972. (U)
 

 313. The Jentink’s Duiker was not listed as endangered until 1979. (U)
 

 314. The Jentink’s Duiker was not listed as protected under the CITES treaty until 1983. (U)
 

 315. Keiffer was in knowing possession of the Jentink’s Duiker when he assisted Hales in returning it to the museum.
 

 316. It is the interest of the citizenry of the United States to meet their international obligations under Treaty Laws. (U)
 

 317. The enforcement of the CITES Treaty by and through the Endangered Species Act goes to the protection of society’s recognized interest in protecting from exploitation certain species of wildlife that inhabit the world.
 

 318. The United States is one of more than one hundred member countries to the CITES Treaty. (U)
 

 319. The United States along with these member countries make up an international community recognizing the importance and sensitivity of certain species of wildlife and the susceptibility of this wildlife to economic pressure and exploitation. (U)
 

 320. The ability and obligation of the United States to meet its treaty obligations under CITES is a societal interest.
 

 321. Asper’s smuggling and possession of the CITES protected wildlife was contrary to the international community’s interest in guarding that wildlife from exploitation.
 

 322. Congress enacted 18 U.S.C. § 545 to supervise and regulate the importation of goods. (U)
 

 323. The purpose of the smuggling statute is to protect the sanctity and integrity of this nation’s borders, and the health and welfare of U.S. citizens from unlawful importations. (U)
 

 324. Part of the legislative history of the smuggling statute provides that “[t]he tremendous increase in international travel and trade, especially by air transportation, has greatly increased the opportunities for smuggling, and apparently smuggling has arisen accordingly ... in view of the fact that large-scale smuggling operations appear to be increasing, the committee feels that the criminal sanctions to § 545 of Title 18 U.S.C. should likewise be increased as an additional deterrent to illegal smuggling ventures.” Senate Report No. 2245, 83rd Congress, 2d Sess.,
 
 reprinted in,
 
 1954 U.S. Cong, and Ad.News 3156. (U)
 

 325. The display of these rare and endangered species of wildlife enhanced the commercial attractiveness of the Fin, Fur and Feather Wildlife Museum.
 

 326. Asper benefitted financially from the exploitation of the endangered and protected wildlife.
 

 327. The following animals were highlighted or otherwise marked in the regulations and other materials located in the files of Asper:
 

 (a) Serow (U)
 

 (b) Goral (U)
 

 (c) Jentink’s Duiker (U)
 

 (d) Northern Huemul (U)
 

 
 *1279
 

 See
 
 Presentence Report ¶ 18 and Defendant’s objection thereto.
 

 328. Asper never told Hales that agents of the Fish and Wildlife Service were checking records at Safari Club International. Asper told Hales that federal agents were checking records at Safari Club International.
 
 See
 
 Presentence Report II 37 and Defendant’s objection thereto.
 

 329. The Jentink’s Duiker taken by Asper in 1984 was substantial in relation to the overall population of the species.
 

 330. The Jentink’s Duiker was a large male, is the No. 1 world’s record, and had significant importance for breeding purposes.
 

 331. Age has no adverse impact on the breeding capacity of a male Jentink’s Duiker.
 

 332. Only between 100 and 200 Jentink’s Duikers exist in the wild today.
 

 333. The Jentink’s Duiker is indigenous to Liberia, the Ivory Coast, and part of Sierra Leone. (U)
 

 334. Between 1000 and 2000 Black-faced Impala are in existence.
 

 335. The Black-faced Impala taken by As-per in 1985 was substantial in relation to the overall population of the species.
 

 336. Between 10000 to 15000 Northern Huemul are in existence.
 

 337. The fact that the Jentink’s Duiker and Huemuls are endangered and protected by CITES, and that the Black-faced Impala is endangered demonstrates that the populations of these animals are low and that these species are facing extinction.
 

 338. Asper moved the Jentink’s Duiker at a time when there was no investigation pending concerning his activities.
 

 339. Asper’s obliteration of the year on the Huemul slide was done at an unknown date.
 

 340. The action of Asper in obtaining letters of donation from Dr. Van Kleek was done prior to the instigation of any investigation in this case.
 

 341. Hales was not aware at the time when he was working for Asper that Asper was committing a violation of federal laws in bringing into the country and possessing certain animals and animal parts.
 

 342. No subpoena was served by the Middle District of Pennsylvania Grand Jury until the search warrant was executed on Asper at his residence and business. (U)
 

 343. Applications for passports require that existing passports be attached to the application.
 

 344. The United States obtained evidence during the search of Asper’s home and businesses which was introduced at trial to establish the dates of the trips taken by Asper for the purposes of obtaining the animals involved in this case. (U)
 

 345. The Fish and Wildlife Service’s investigation targeting Asper started on May 4, 1989. (U)
 

 346. Asper first became aware of the instant investigation in November of 1989 when the search warrant was executed. (U)
 

 347. The Jentink’s Duiker was moved back into the museum prior to May 4, 1989. (U)
 

 348. Asper was not a target, by name, of the federal investigation of SCI in January 1989. (U)
 

 349. Asper obliterated the date on the Huemul slide.
 

 350. The date on the slide was obliterated prior to November 1, 1989. (U)
 

 351. The fictitious donation letters from Cecil Van Kleek were created prior to May 4, 1989.
 

 352. The taxidermists Paulshock, Boone, Rhinehart and Bivona were not employees of Asper. (U)
 

 353. All of the animals involved are not indigenous to the United States. (U)
 

 354. The animals which were detained in the Mexican customs warehouse were not the same animals which are involved in the present case. (U)
 

 355. Asper did not have control over the taxidermists involved in this case.
 

 356. Asper was a leader of a criminal activity that involved one more participant.
 

 
 *1280
 
 357. Asper was the decisionmaker throughout the course of his extensive criminal activity which spanned many years.
 

 358. The Black-faced Impala is available to hunters on game ranches in Namibia. (U)
 

 359. Nepal, Peru and Liberia are members of the International Union for the Conservation of Nature and Natural Resources (IUCN). (U)
 

 360. The Jentink’s Duiker was listed on Appendix II of the CITES Treaty in May 1984. (U)
 

 361. There was no evidence presented establishing with certainty the pecuniary gain to Asper resulting from his criminal activities.
 

 III. Discussion
 

 A. Commercial Purpose
 

 The Probation Officer recommends a two-level upwards adjustment pursuant to U.S.S.G. § 2Q2.1(b)(l) which states that “[i]f the offense involved a commercial purpose, increase by 2 levels.” We are of the view that a two-level upwards adjustment because the offense involved a commercial purpose is clearly warranted.
 

 Commercial is defined as “[rjelating to or connected with trade and traffic or commerce in general.” Black’s Law Dictionary (4th Ed.) at 337. The Aspers operate a complex of businesses known as the Fin, Fur and Feather Trading Post, the Fin, Fur and Feather Sporting Goods- Store and the Fin, Fur and Feather Wildlife Museum. Asper argues that there was no commercial purpose involved in the activities which form the basis of the charges on which he was found guilty because the museum for which the animals were obtained was operated at a loss.
 

 Assuming arguendo that the museum was operated at a loss, this does not establish that Asper’s activities were not for a commercial purpose. Not all businesses prosper. The Fin, Fur & Feather Wildlife Museum is a major tourist attraction in northern central Pennsylvania. Visitors to the museum are charged five dollars per person to view the wildlife displays at their leisure or with the assistance of a tour guide. Between April 15, 1985 and December, 1989, 41,009 people paid $205,046 admission fees to visit the museum. Whether or not the museum was operated at a loss is not dispositive because the museum obviously operated as a “calling card” for As-per’s other businesses. Moreover, and more importantly, Asper amortized and deducted the cost of his “hunting expeditions” as a business expense on his income tax returns at least for the following four accounting periods: fiscal years ending March 31, 1986, and March 31, 1987, and calendar years 1987 and 1989. If Asper’s hunting expeditions expenses were not business expenses, he had no right to deduct them for income tax purposes. The total amount of Asper’s travel and hunting expenditures for the above four periods was $140,792.00. The wildlife trophies also were depreciated for income tax purposes. The Aspers filed federal partnership business income tax returns for Paul Asper Enterprises which encompassed the Fin, Fur and Feather Wildlife Museum. As-per’s contract with the National Taxidermists Association specifically provided “that the Aspers shall operate said museum on a commercial basis.... ” There are numerous other factors set forth in the findings of fact which are not necessary to enumerate which prove that Asper’s criminal activities were directly related to his business of operating the museum. From all of this we conclude that Asper’s criminal activities obviously had a commercial purpose.
 

 B. Value of the Animal Parts
 

 The Probation Officer indicated in paragraph 61 of the presentence report that the wildlife parts had a market value of $86,000. The source of this value was an appraisal by Roderick F. Connelly, a taxidermist, from Pittsburgh, Pennsylvania. Based on the market value of $86,000 the Probation Officer recommended a six-level upwards adjustment pursuant to U.S. S.G. §§ 2Q2.1(b)(3)(A) and 2Fl.l(b)(l)(G). U.S.S.G. § 2Q2.1(b)(3)(A) provides:
 

 If the market value of the specially protected fish, wildlife, or plants exceed
 
 *1281
 
 ed $2000, increase the offense level by the corresponding number of levels from the table in § 2F1.1 (Fraud and Deceit)
 

 U.S.S.G. § 2Fl.l(b) provides:
 

 (b) Specific Offense Characteristics
 

 (1) If the loss exceeded $2000, increase the offense level as follows:
 

 Loss (Apply the Greatest) Increase in Level
 

 (A) $2,000 or less. no increase
 

 (B) More than $2,000 add
 

 (C) More than $5,000 add
 

 (D) More than $10,000 add
 

 (E) More than $20,000 add
 

 (F) More than $40,000 add
 

 (G) More than $70,000 add
 

 (H) More than $120,000 ■add 7
 

 Contraband such as endangered species has no legal market, save acquisition by those institutions qualifying for exception under 16 U.S.C. § 1539.' Neither U.S.S.G. § 2Q2.1, nor its accompanying commentary, defines the term market value. § 2Q2.1(b)(3)(A) specifically refers to § 2F1.1 (Fraud and Deceit) to determine the appropriate level for adjustment of the offense level. Application Note 7 of the Commentary to § 2F1.1 refers to yet another guideline, § 2B1.1, for the definition of “value.” Application Note 2 of the Commentary to § 2B1.1 provides in part:
 

 “Loss” means the value of the property taken, damaged or destroyed. Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the Court may measure loss in some other way, such as reasonable replacement cost_
 

 Application Note 8 of the Commentary to § 2F1.1 indicates that the amount need not be exact or precise: “The Court need only make a reasonable estimate of the range of loss given the available information.” In
 
 United States v. Wilson,
 
 900 F.2d 1350 (9th Cir.1990), the Court of Appeals- held that where market value is difficult to ascertain, a District Court may use a reasonable method to measure the loss under § 2F1.1 and is not limited to a strict market valuation of loss. The Court stated:
 

 A strict market approach measures only the gain to the defendant while virtually ignoring the harm suffered by the victim. (Citations oinitted.) In light of these considerations, and the Guidelines’ provision for other methods of valuation, we reject a strict market valuation approach under the guidelines and reiterate that “where goods have no readily ascertainable market value, ‘any reasonable method may be employed to ascribe an equivalent monetary value' to the items.’ ” (Citations omitted.)
 

 Id.
 
 at 1356. Similarly, in
 
 United States v. Pemberton,
 
 904 F.2d 515 (9th Cir.1990), the Court of Appeals rejected the Defendant’s argument that the appropriate measure of the value of stolen drawings he illegally possessed was what the drawings were worth to him, i.e., zero. After reviewing the application notes to § 2B1.2 of the guidelines, the Court held that the drawings were unique items for which there was not a broad and active market which could have supplied a readily ascertainable price and that a valué not based on market was appropriate.
 
 Id.
 
 at 517.
 

 In the instant case, the wildlife - are unique items for which there is not a broad and active market: Therefore, in determin
 
 *1282
 
 ing the value of the wildlife, we are not limited to a strict market valuation. There is certainly no fair market value. We may consider the appraisal of taxidermists based on the cost of replacement and acquisition of the wildlife and other data.
 

 As the commentaries to §§ 2B1.1 ánd 2F1.1 of the guidelines and
 
 Wilson
 
 and
 
 Pemberton
 
 make clear, we may determine the value from any reliable information. During the hearing three witnesses testified regarding the value of the wildlife trophies: William Lee Birch, Richard O. Roan and Roderick F. Connelly. Birch appraised the wildlife trophies at $16,400.00. We are of the view that his valuation is low because he failed to consider scientific value, record book ranking and rarity. Roan testified that the value at public auction is $8050.00. We decline to utilize this figure because the trophies in question cannot be sold at public auction. Replacement or acquisition cost is a more accurate reflection of the value of the wildlife trophies. Con-nelly testified that the value of the wildlife mounts is $101,383.50, up from his prior $86,000 appraisal adopted by the Probation Officer. We are of the view that his valuation is extremely high. First, we are not convinced that the hunting costs are a reasonable factor. Birch testified that it is possible to obtain wildlife parts from the country of origin of the species without going on a hunting expedition. Second, we are not convinced that Connelly’s taxidermy costs are a proper or necessary factor. For example, Connelly testified that the taxidermy cost for the Jentink’s Duiker is $2,000.00. Ken Rhinehart mounted the Jentink’s Duiker for $821.00 in Waterville, Pennsylvania.
 

 In the findings of fact set forth above we adopted as a basis Mr. Birch’s costs of acquisition and made appropriate adjustments for scientific value, record book ranking and rarity. Our adjustments for each animal are shown in the findings of fact. We conclude that the value of the wildlife mounts in question is approximately $30,800.00. Therefore, we will increase the base offense level upwards four levels pursuant to § 2F1.1(b)(1)(E) on value alone.
 

 Furthermore, with regard to this adjustment upwards of four levels we are of the view that it is also required by U.S.S.G. § 2Q2.1(b)(3)(B) which indicates:
 

 If the offense involved a quantity of fish, wildlife, or plants that was substantial in relation either to the overall population of the species or to a discrete subpopulation, increase by 4 levels.
 

 Dr. Duane A. Schlitter, curator at the Carnegie Museum, testified that the world population of the Jentink’s Duiker is approximately 100 to 200 and that in his opinion the killing of the large male Jentink’s Duiker in this case was substantial in relation to the overall population. His testimony is credible.
 

 C. Obstruction of Justice
 

 The Probation Officer has recommended that the base offense level, be increased by two levels pursuant to U.S.S.G. § 3C1.1. on the ground that Asper obstructed justice during the investigation or prosecution of the offenses.
 

 U.S.S.G. § 3C1.1 provides:
 

 Willfully Obstructing or Impeding Proceedings
 

 If the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice during the investigation or prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.
 

 There are four alleged incidents of obstruction of justice. The first incident concerns the instruction to an employee in 1989 by Asper to hide the Jentink’s Duiker and photographs of the hunt for that animal. Asper objects to any increase in the offense level based upon this incident because an increase would impose multiple punishment for the same conduct, a result which is impermissible under the Sentencing Guidelines. Asper argues that the “concealment” upon which the Probation Officer relies to justify an adjustment for obstruction of justice pursuant to § 3C1.1, constitutes part of the offense charged in Count 5 of the indictment. We find merit in this argument. The conduct necessary to make out the offense set forth in Count
 
 *1283
 
 5, which includes concealment and facilitation of transportation of certain merchandise after importation was considered by the Sentencing Commission in establishing the base offense level of six under U.S.S.G. § 2Q2.1. The Sentencing commission did not intend that the obstruction of justice enhancement apply to the same conduct.
 
 See United States v. Werlinger,
 
 894 F.2d 1015, 1016-17 (8th Cir.1990) (Two point increase in base offense level for obstruction is inapplicable to defendant’s inducement of co-worker to assist in concealment of his embezzlement; such conduct is accounted for in the guideline applicable to the substantive offense.) Furthermore, the concealment took place prior to the investigation of the instant offense although As-per was then aware that he might become a target.
 

 The second incident concerns Asper’s alleged procurement of fictitious donation certificates from Dr. Cecil van Kleek to show that the Gorals and Jen-tink’s Duiker were donated prior to the enactment of the Endangered Species Act of 1973.
 

 The third incident concerns Asper’s alleged removal of the date from a' slide photograph which shows the hunt of the Northern Huemul in 1978.
 

 We are of the view that the second and third incidents are not a basis for an adjustment pursuant to § 3C1.1 because the Government has not shown that they took place during the investigation or prosecution of the instant offenses.
 
 Cf. United States v. Wilson,
 
 904 F.2d 234 (5th Cir.1990).
 

 The fourth such incident concerns Asper’s intentional failure to surrender all passports in his possession in response to a grand jury subpoena issued on February 1, 1990.
 

 Asper contends that his failure to produce the passport was not willful but instead was attributed to inadvertence and was not a conscious attempt to obstruct the investigation. Asper contends that his wife, Carole, found the passport and immediately turned it over. Mrs. Asper’s discovery of the passport did not occur until after Asper was ordered detained following the jury’s verdict, in part because of the unexplained second viable, valid passport. At the initial bail hearing, the Government argued that Asper was a flight risk and produced records from the United States Department of State to establish that As-per had been issued two passports, both of which were still valid and only one of which was accounted for. The Government argued that since Asper surrendered only one passport, he certainly possessed one remaining valid passport, and therefore, posed a risk of flight.’ When facing another hearing to determine whether he should remain in custody, then and only then did the second passport materialize. It is also important that the undelivered passport Z4972090 was the passport used by Asper on trips during which the subject endangered species were illegally imported into the United States.
 

 It is clear, by a preponderance of the evidence, that Asper’s action in failing to turn over the passport was willful, and was calculated to mislead and deceive the United States Fish and Wildlife Service, the United States Department of Justice and the grand jury in the investigation and prosecution of this matter. Therefore, a two-level upwards adjustment for obstruction of justice is warranted.
 

 D. Role of Asper in the Offense
 

 The Probation Officer has recommended that an increase of two offense levels is justified pursuant to U.S.S.G. § 3Bl.l(c) because Asper was an organizer, leader, manager or supervisor in the criminal activity. The Government contends however that an increase of four offense levels is warranted pursuant to U.S.S.G. § 3B 1.1(a) because Asper was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. Asper contends that no increase is warranted for his role in the offenses.
 

 For purposes of guideline calculations Asper’s criminal activities of which he was found guilty covered only a period of time
 
 *1284
 
 from November 1, 1987, to on or about November 1, 1989. Asper knew that law enforcement agencies had an interest in the animals displayed. With this in mind As-per manufactured paperwork to cover his illegally imported trophies. He procured letters alleging donation of various endangered species falsely dated prior to the enactment of the Endangered Species Act.
 

 In order to achieve success of the museum venture, Asper needed the services of numerous individuals. Several assisted As-per in his attempts to bring the wildlife parts into the country. Many more assisted Asper in the preparation and display of these animals once they were in the United States.
 

 U.S.S.G. § 3B1.1 provides:
 

 Based on the defendant’s role in the offense, increase the offense level as follows:
 

 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
 

 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
 

 (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.
 

 Participant is defined in the Commentary, Application Note 1, as “a person who is criminally responsible for the commission of the offense, but need not have been convicted.” Thus in order to be a “participant” in the instant case, the individual must be criminally responsible either as an accomplice or coconspirator for one or more of the offenses of which Asper was found guilty. From this it follows that in order to increase the offense level pursuant to 3Bl.l(a) there must be five or more individuals criminally responsible for at least one of the offenses that Asper was found guilty of having committed or the criminal activity was otherwise extensive.
 

 The plain language of U.S.S.G. § 3Bl.l(a) or (b) authorizes an increase for an “otherwise extensive” operation, regardless of the number of participants. However, the Introductory Commentary to “Part B — Role in the Offense” of the Sentencing Guidelines provides in part:
 

 This Part provides adjustments to the offense level based upon the role the defendant played in committing the offense .... When an offense is committed by more than one participant, § 3B1.1 or 3B1.2 (or neither) may apply. Section 3B1.3 may apply to offenses eom-mited by any number of participants.
 

 Application Note 2 provides that “[i]n assessing whether an
 
 organization
 
 is ‘otherwise extensive,’ all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only
 
 three participants
 
 but used the unknowing services of many outsiders could be considered extensive.” (Emphasis added.)
 

 The Introductory Commentary specifically indicates that § 3B1.1 applies when the offense is committed by more than one participant. Application Note 2 refers to “organization” and “three participants.” From this we conclude that despite the plain language of the guideline “[t]he offense of conviction itself must involve more than one participant.”
 
 United States v. Williams,
 
 891 F.2d 921, 926 (D.C.Cir.1989). There must be one other person criminally responsible for at least one of the offenses of which Asper was found guilty before we can apply § 3B1.1 or consider whether the activity was otherwise extensive.
 
 See United States v. Carroll,
 
 893 F.2d 1502 (6th Cir.1990). In
 
 Carroll
 
 the Court of Appeals held that “enhancement pursuant to § 3B1.1 requires the participation of at least two culpable individuals so that leadership of some criminal enterprise or organization, however minimal, can be claimed.”
 
 Id.
 
 at 1509.
 
 See also United States v. DeCicco,
 
 899 F.2d 1531 (7th Cir.1990);
 
 United States v. Fuller,
 
 897 F.2d 1217 (1st Cir.1990). Furthermore, § 3B1.1 requires us “to look at [Asper’s] role in the offense of conviction, not his role in any relevant aggravating conduct in which he may have engaged.”
 
 Williams,
 
 891 F.2d at 925.
 

 
 *1285
 
 A divided panel of the Ninth Circuit reached a different conclusion in
 
 United States v. Anderson,
 
 895 F.2d 641 (9th Cir.1990). The Ninth Circuit on September 5, 1990, granted rehearing,
 
 United States v. Anderson,
 
 911 F.2d 380 (9th Cir.1990). As of the time of filing this opinion no further opinion in
 
 Anderson
 
 is available by electronic search. We decline to follow
 
 Anderson
 
 because rehearing in that case is pending and the majority ignored the Commentary and Notes when applying the Sentencing Guidelines. We agree with the dissent in
 
 Anderson
 
 that Courts are required to consider the Commentary in interpreting and applying the Guidelines.
 
 See
 
 895 F.2d at 647. 18 U.S.C. § 3553(a) provides that “[t]he court, in determining the particular sentence to be imposed, shall consider ... any pertinent policy statement issued by the Sentencing Commission ...” “Reading § 3B1.1 in light of its Commentary and Notes yields the conclusion that the Sen-' tencing Commission intended that it apply to situations where an offender organizes criminally responsible individuals.”
 
 DeCicco,
 
 899 F.2d at 1537.
 

 The Court of Appeals for the Third Circuit has addressed the application of U.S.S.G § 3B1.1 on two occasions. In both of these cases it was clear that there was at least one other person criminally responsible involved.
 

 In
 
 United States v. Ortiz,
 
 878 F.2d 125 (3rd Cir.1989) the defendant Angel Ortiz who was charged with various drug related offenses did not dispute that there were five or more persons involved in the criminal activity. Instead, Ortiz argued that “the District Court should not have found him to be an organizer or leader under the guidelines, but merely a ‘manager or supervisor.’.”
 
 Id.
 
 at 126.
 

 The Court of Appeals stated that “the question of a defendant’s aggravating role in this crime is ‘essentially factual,’ we will reverse the district court in this case only if its conclusion is clearly erroneous.”
 
 Id.
 
 at 127. The District Court found that Ortiz performed the role of a principal in the transaction, made the decision regarding the place, quantity and the price to be paid for the cocaine, gave directions to some of the others involved in the transaction, directed his son Bobby Luis Ortiz to act as a lookout, directed that the transaction and the actual exchange take place in his van although he was not present in the van when the transaction took place and helped recruit at least two of the accomplices. Ortiz did not dispute any of these findings. The Court of Appeals concluded that the District Court’s “finding that Ortiz was an organizer or leader within the meaning of the guidelines was not clearly erroneous.”
 
 Id.
 

 In
 
 United States v. Wickstrom,
 
 893 F.2d 30 (3rd Cir.1989) the Court of Appeals faced a similar argument. -The case involved a six count indictment against co-defendants James P. Wickstrom, Victor F. Rizzo, Thomas Martin Ryan, David F. Gardner, and Harry Charles Luttner. Riz-zo was charged with conspiracy, purchase of counterfeit U.S. currency, conspiracy to possess unregistered firearms and possession of unregistered firearms. Rizzo pled guilty to possession of counterfeit currency and conspiracy to possess unregistered firearms.
 

 Rizzo argued that the District Court erred when it found that Rizzo had played the role of a manager or supervisor in the commission of the offenses. The District Court based this finding on the evidence that Rizzo made the initial contact with the undercover agent who was posing as a mafia member in order to establish a supply of counterfeit currency, provided the agent with the paper on which to print the counterfeit currency, met with .the agent and asked if he could obtain false identification papers and silencers for .22 caliber Rugers and paid for the silencers which the agent had sold to him.. The Court of Appeals concluded there was sufficient evidence to support the District Court’s finding that Rizzo played a supervisory or managerial role and thus did not err by increasing Rizzo’s offense level upwards two levels.
 

 In light of the above, we are of the view that before we may impose an upwards adjustment pursuant to § 3B1.1 there must
 
 *1286
 
 be at least one other individual criminally responsible for at least one of the offenses which Asper was convicted of having committed and that Asper was an organizer, leader, manager or supervisor of the criminal activity.
 

 The Government argues that the following were criminally responsible persons: John Boone, Cecil van Kleek, Kenneth Rhinehart, Thomas Paulshock, Clifford Hales, and Carole Asper.
 

 First, Boone was the taxidermist who mounted the two Gorals. The Government argues that during the two years Boone worked on the Gorals, correspondence between Boone and Asper proves that both clearly knew the animals were listed as endangered and that Boone may have known that the Gorals were brought into the United States illegally and took steps to cover detection. The Government contends that Boone’s possession of the illegally imported Gorals subjected him to responsibility under 16 U.S.C. Section 1538(c)(1). However, Asper was charged and found guilty of possessing the Gorals from on or about July, 1989, until on or about November 1, 1989. Boone’s alleged criminal activities relate to an entirely different time. Therefore, Boone cannot be criminally responsible for Asper’s possession of the Gorals as charged.
 

 Second, the Government contends that Cecil van Kleek is a criminally responsible participant in Asper’s' schemes when he produced false letters alleging donation'of the Jentink’s Duiker and the Gorals. The Government has failed to show that Cecil van Kleek is criminally responsible for any of the offenses as to which Asper was found guilty.
 

 Third, the Government contends that Kenneth Rhinehart, another taxidermist, is criminally responsible because he possessed the Jentink’ Duiker when he was directed by Asper to mount it. Again the Government’s position is flawed. The tanned skin of the Jentink’s Duiker was mounted in July of 1984. Counts 5 and 6 relate to a different time period and thus Rhinehart cannot be criminally responsible for Asper’s possession.
 

 Fourth, Thomas Paulshock, performed taxidermy work on the Black-faced Impala and the Serow. The Government contends that Paulshock is criminally responsible for the possession of the Black-faced Impala and the Serow. However, the Government has failed to show that Paulshock is criminally responsible for any of the offenses that Asper was found guilty of having committed.
 

 Fifth, Clifford Hales in January of 1989 secreted the Jentink’s Duiker and photographs of the hunt for that animal. The Government contends that Hales is criminally responsible for the possession and concealment of the Jentink’s Duiker. We cannot conclude that Clifford Hales is criminally responsible for aiding and abetting Asper’s concealment of the Jentink’s Duiker because the Government has failed to show that Hales knew that the Jentink’s Duiker was imported contrary to law. However, we are faced with the question, did Hales aid and abet Asper’s possession of the Jentink’s Duiker which does not require knowledge on the part of Hales that the animal was imported contrary to law? We conclude that Hales did not aid or abet Asper’s possession. Asper was found guilty of possession of the Jentink’s Duiker during the period July 1989 to November 1, 1989. The Government has failed to show how Hales aided and abetted Asper’s possession during this time.
 

 Finally, the Government argues that Carole J. Asper possessed the Black-faced Impala and Serow which she transported to and from Baltimore for the taxidermist, Thomas Paulshock. The Government argues that under the general intent liability of the Endangered Species Act, Mrs. Asper is a person criminally responsible for the possession of the Black-faced Impala and Serow while she transported them. Paul Asper was found guilty of importing, receiving and facilitating the transportation of the Black-faced Impala. These offenses require knowledge that the Black-faced Impala was imported contrary to law. Although Carole Asper could possibly be found criminally responsible for
 
 *1287
 
 her own possession under the Endangered Species Act and under the Lacey Act, 16 U.S.C. § 3372, et seq., she cannot be considered criminally responsible for the offenses set forth in Counts 7, 8 and 9 of the indictment involving the Black-faced Impala and Counts 1, 2 and 3 involving the Serow.
 

 However, there remain a number of possession counts involving the Serow, Jen-tink’s Duiker, Gorals and Northern Huefti-uls (Counts 4, 6 and 15 through 19). It has been argued by present defense counsel that Carole Asper can only be criminally responsible for possession if she knew that the animals were classified as endangered species. This argument is contrary to the point for charge relating to possession submitted by former defense counsel at the time, of trial which reads:
 

 14. Possession (16 U.S.C. § 1538)
 

 In order to find the guilty (sic) of the counts of the indictment charging the Defendant with a violation of 16 U.S.C. § 1538, the government must prove each of the following elements beyond a reasonable doubt:
 

 1. That the defendant knowingly possessed the body parts of the charged species of wildlife;
 

 2. That the said body parts in fact are what the government has alleged them to be, i.e., the body parts of the specific species of wildlife as charged; and
 

 3. That the said body part were traded contrary to the provisions of the Convention On International Trade In Endangered Species of Wild Fauna and Flora, TIAS 8249 (“CITES”), and Title 50, Code of Federal Regulations, Part 23.
 

 In support of this point for charge former defense counsel relied on the cases of
 
 United States v. St. Onge,
 
 676 F.Supp. 1044 (D.Montana 1988) and
 
 United States v. Billie,
 
 667 F.Supp. 1485 (S.D.Fla.1987).
 

 In
 
 St. Onge
 
 the prosecution was for illegally taking a grizzly bear. The Court held that the Government was not required to show that the defendant had the specific intent to take a grizzly bear, as it was sufficient to show that he knowingly took an animal and that the animal was a grizzly bear. The Court stated:
 

 This construction of the “knowingly” requirement would best give effect to the regulatory and protective nature of the Act. The purposes of the Endangered Species Act would be thwarted if the court were to adopt the defendant’s construction of the Act. The critical issue is whether the act was done knowingly, not whether the defendant recognized what he was shooting. The scien-ter element applies to the act of taking; thus, the defendant could only claim accident or mistake if he did not intend to discharge his firearm, or the weapon malfunctioned, or similar circumstances occurred.”
 

 676 F.Supp. at 1045.
 

 The
 
 Billie
 
 case involved the prosecution of a Seminole Indian under the Endangered Species Act for the taking and subsequent possession, carrying and transportation of a Florida panther. The Court held that the Government was not required to prove that the defendant recognized the particular subspecies of panther listed as endangered at time of the shooting, but was only required to prove that he acted with general intent when he shot the animal.
 
 See
 
 667 F.Supp. at 1492.
 

 Carole Asper was a partner in Paul As-per Enterprises which encompassed the Fin, Fur and Feather Wildlife Museum. We conclude that because Carole Asper was a partner in the museum venture which housed these wildlife parts she is criminally responsible for their possession and aiding and abetting her husband’s possession. Carole Asper was guilty of possession and aided and abetted her husband’s possession when she transported the Black-faced Impala and Serow to and from Baltimore. Therefore, Carole Asper is a criminally responsible participant per U.S.S.G. § 3B1.1.
 

 There remain two questions to be answered:
 

 (1) Was Paul Asper an organizer, leader, manager or supervisor of the criminal activity?
 

 
 *1288
 
 (2) Was the criminal activity “otherwise extensive”?
 

 In light of Paul Asper’s criminal activities from on or about Nov. 1, 1987 to on or about November 1, 1989, involving the importation of the wildlife parts and the arrangements for mounting and displaying the various animals, we conclude that Paul Asper was an organizer or leader and the criminal activity was “otherwise extensive” pursuant to U.S.S.G. § 3Bl.l(a). Therefore, a four-level upwards adjustment is warranted.
 

 E. Grouping of Counts
 

 The presentence report groups all guideline counts into a single group in accordance with U.S.S.G. § 3D1.2(b) which provides in part:
 

 All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
 

 if
 
 j): :j: :}:
 

 (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
 

 In order to be grouped together under Section 3D1.2(b), the offenses must involve the same victim and two or more acts or transactions connected by a common scheme or plan. The Probation Officer considered that all of the counts worked against the same victim: society in general. We are of the view that all of the counts should be placed in one group. However, the analysis is somewhat more difficult.
 

 Application Note 2 of § 3D1.2 states that “for so-called ‘victimless’ crimes (crimes in which society at large is the victim), the grouping decision must be based primarily upon the nature of the interest invaded by each offense.”
 

 The Government argues that the counts grouped by the Probation Office do not include the same victim and so-called vie-' timless crimes, i.e., those against society, are not required to be grouped together. The Government argues that there are two distinct victims and two separate interests invaded. The two victims are said to be the citizens of the United States and the citizens of the world. The Government contends that the two interests are the interest of the world in insuring the preservation of certain animals and the interest of. the United States in protecting the nation’s borders. The Government would group the counts into two groups: the counts that charge possession of the endangered animals (Counts 4, 6, and 15 through 19) and in a separate group, the counts that charge violations of 18 U.S.C. § 545 (Counts 1 through 3, 5, 7 through 9, 13 and 14). Such a grouping would increase the adjusted offense level by 2 levels.
 

 The first problem with the grouping scheme proposed by the Government is that Counts 1 through 3, 7 and 8 are pre-guideline counts and cannot be considered in calculating the guidelines. Second, we are of the view that the two types of offenses are directly related to the same interest and involve substantially the same harm. Under the Endangered Species Act it is illegal to possess certain animals. Under 18 U.S.C. § 545 it is illegal to bring them into the United States. The interest invaded is substantially the same: the preservation of certain species of wildlife.
 

 F. Objections to Factual Statements in the Presentence Report
 

 Asper objected to certain factual statements contained in the pre-sentence report. He set forth these objections in his letter dated October 16, 1990, to the probation officer. In that letter Asper contended: (1) ¶ 18 of the presentence report incorrectly states that the Black-Faced Impala and one other animal were highlighted in the regulations or materials seized from As-per’s basement; (2) ¶ 20 sets forth information not admitted at trial regarding Asper’s attempt to smuggle into the U.S. in 1976 the hides of an endangered Nile crocodile and an endangered leopard by hiding them in the folds of an elephant hide; (3) II21 sets forth information not admitted into evidence,
 
 i.e.
 
 those sections of the two tele
 
 *1289
 
 phone conversation records with Fish and Wildlife Service agents that were excised at Asper’s request at trial; (4) ¶ 37 of the presentence report incorrectly provides that Asper told Clifford Hales that the Fish and Wildlife Service was checking records at the Safari Club International Headquarters. Asper claims that the evidence was that records were being checked by federal agents at the Safari Club International but not specifically by agents of the Fish and Wildlife Service.
 

 We disposed of these contentions in the above findings of fact adversely to the Defendant except as to two minor matters relating to Paragraphs 18 and 37 of the presentence report. Those two matters are covered in Asper’s favor in Paragraphs 192 and 327 of the Findings of Fact and it is not necessary to set forth any further discussion regarding them. Asper is correct in his objection that the Black-faced Impala was not highlighted in his copy of the regulations.
 

 IV. Conclusions of Law
 

 These conclusions relate only to the guideline counts which are Counts 4 through 6, 9, and 13 through 19.
 

 1. The base offense level is 6.
 

 2. A two-level upwards adjustment for commercial purpose pursuant to U.S.S.G. § 2Q2.1(b)(l) is appropriate.
 

 3. A two-level upwards adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1 is appropriate.
 

 4. Paul Asper’s criminal activity from November 1, 1987, until on or about November 1, 1989, was “otherwise extensive” under U.S.S.G. § 3B1.1.
 

 5. Carole Asper is a criminally responsible participant under U.S.S.G. § 3B1.1.
 

 6. A four-level upwards adjustment for Asper’s role in the offense pursuant to U.S.S.G. § 3Bl.l(a) is appropriate.
 

 7. A four-level upwards adjustment is warranted by reason of the value of the animals and the number of wildlife being substantial in relation to the overall population of the species pursuant to U.S.S.G. §§ 2F1.1(b)(1)(E) and 2Q2.1(b)(3)(B).
 

 8. Counts 4 through 6, 9, and 13 through 19 of the indictment are properly grouped together into a single group pursuant to U.S.S.G. § 3D1.2.
 

 9. A two-level upwards adjustment requested by the Government for the grouping of the counts pursuant to U.S.S.G. §§ 3D1.3 and 3D1.4 is not warranted.
 

 10. A fine three times the gross pecuniary gain from the criminal activity as requested by the Government under U.S.S.G. § 5E1.2(c)(2)(C) is not warranted.
 

 11. The total offense level in this case is 18.
 

 12. The Criminal History Category is I.
 

 13. The guideline imprisonment range is 27 to 33 months.
 

 14. The guideline fine range is $6,000.00 to $60,000.00.
 

 An appropriate order will be entered.